This Opinion is a
Precedent of the TTAB

Hearing: July 12, 2017                    Mailed: March 26, 2018

**UNITED STATES PATENT AND TRADEMARK OFFICE**

———

**Trademark Trial and Appeal Board**

———

*In re Serial Podcast, LLC*

———

Serial Nos.
86454420
86454424
86464485

———

Matthew T. Furton, Sean C. Fifield, and David T. Van Der Laan
     of Locke Lord LLP, for Serial Podcast, LLC.

Colleen M. Dombrow, Trademark Examining Attorney, Law Office 101,
     Ronald R. Sussman, Managing Attorney.

———

Before Taylor, Shaw and Heasley,
     Administrative Trademark Judges.

Opinion by Heasley, Administrative Trademark Judge:

Serial Podcast, LLC ("Applicant") seeks registration on the Principal Register of

three marks:

SERIAL (in standard characters);[1]

---

[1] Application Serial No. 86454420 was filed on November 14, 2014, based upon a claim of first use anywhere and use in commerce since at least as early as September 19, 2014. 15 U.S.C. § 1051(a).

 (word and design);[2] and

(word and design).[3]

All three marks are for "entertainment in the nature of an ongoing audio program featuring investigative reporting, interviews, and documentary storytelling" in International Class 41.

The Examining Attorney has refused registration of all three marks on the grounds that each is generic for the identified services, or, if not generic, merely descriptive of the services. 15 U.S.C. §§ 1051, 1052(e)(1), 1053, and 1127. In each case, Applicant has responded that the mark is not generic, and has acquired distinctiveness under Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f). The Examining Attorney has nonetheless maintained the genericness refusals and has found Applicant's evidence insufficient to prove acquired distinctiveness. When the refusals were made final, Applicant appealed and requested reconsideration. After the Examining Attorney denied the requests for reconsideration, the appeals

---

[2] Application Serial No. 86454424 was filed on November 14, 2014, based upon a claim of first use anywhere and use in commerce since at least as early as September 19, 2014. 15 U.S.C. § 1051(a). The Application includes the following description of the mark: "The mark consists of the word 'SERIAL' in outlined letters, with each letter placed in a rectangle with rounded corners." Color is not claimed as a feature of the mark.

[3] Application Serial No. 86464485 was filed on November 25, 2014, based upon a claim of first use anywhere and use in commerce since at least as early as September 19, 2014. 15 U.S.C. § 1051(a). The Application includes the following description of the mark: "The colors red, yellow and black are claimed as a feature of the mark. The mark consists of the word 'SERIAL' in yellow letters outlined in red, with each letter placed in a black rectangle with rounded corners. The color white in the drawing represents background and is not a feature of the mark."

resumed and were consolidated.[4] Applicant and the Examining Attorney submitted briefs, and appeared at an oral hearing before the Board.

## I.  THE STANDARD CHARACTER MARK

The Examining Attorney maintains that the proposed standard character mark, SERIAL, is generic for the services recited in the application. Applicant maintains that the proposed mark is not generic, but descriptive, and has acquired distinctiveness under Section 2(f), which states that "nothing in this chapter shall prevent the registration of a mark used by the applicant which has become distinctive of applicant's goods [or services] in commerce." 15 U.S.C. §§ 1052(f), 1053.

### A.  The Proposed Standard Character Mark, SERIAL, Is Generic

"A generic term is the common descriptive name of a class of goods or services." *In re Cordua Rests., Inc.,* 823 F.3d 594, 118 USPQ2d 1632, 1634 (Fed. Cir. 2016) (quoting *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 114 USPQ2d 1827, 1830 (Fed. Cir. 2015) and *H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.*, 782 F.2d 987, 228 USPQ 528, 530 (Fed. Cir. 1986) (internal punctuation omitted)). Generic terms are "the ultimate in descriptiveness." *Marvin Ginn,* 228 USPQ at 530, *quoted in In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 116 USPQ2d 1262, 1264 (Fed. Cir. 2015). They are not registrable because "[g]eneric terms, by definition incapable of indicating source, are the antithesis of trademarks, and can never attain trademark status." *In re Merrill Lynch, Pierce, Fenner, & Smith, Inc.*,

---

[4] 14 TTABVUE. Unless otherwise stated, all references to the record and the arguments pertain to Application Serial No. 86464485. All references to the Trademark Status & Document Retrieval ("TSDR") database are to the downloadable .pdf version.

828 F.2d 1567, 4 USPQ2d 1141, 1142 (Fed. Cir. 1987), *quoted in Cordua*, 118 USPQ2d at 1634.

"The critical issue in genericness cases is whether members of the relevant public primarily use or understand the term sought to be protected to refer to the genus of goods or services in question." *Marvin Ginn*, 228 USPQ at 530, *quoted in Earnhardt v. Kerry Earnhardt, Inc.,* 864 F.3d 1374, 123 USPQ2d 1411, 1413 (Fed. Cir. 2017). Making this determination "involves a two-step inquiry: First, what is the genus of goods or services at issue? Second, is the term sought to be registered … understood by the relevant public primarily to refer to that genus of goods or services?" *Marvin Ginn*, 228 USPQ at 530; *see Luxco, Inc. v. Consejo Regulador del Tequila, A.C.,* 121 USPQ2d 1477, 1483 (TTAB 2017). The Examining Attorney must establish with clear and convincing evidence that a proposed mark is generic. *Cordua*, 118 USPQ2d at 1635.

The Examining Attorney and Applicant concur that the genus in this case is set forth by the recitation of services in each subject application: "entertainment in the nature of an ongoing audio program featuring investigative reporting, interviews, and documentary storytelling." *See generally Cordua,* 118 USPQ2d at 1636; *Magic Wand Inc. v. RDB Inc.,* 940 F.2d 638, 19 USPQ2d 1551, 1552 (Fed. Cir. 1991) ("[A] proper genericness inquiry focuses on the description of services set forth in the [application or] certificate of registration."). The relevant public consists of ordinary listeners of audio programs.[5] Evidence of the relevant public's understanding of a

---

[5] Applicant's brief p. 7, 7 TTABVUE 10, Examining Attorney's brief 9 TTABVUE 6.

term may be obtained from any competent source, including testimony, surveys, dictionaries, trade journals, newspapers and other publications. *See Cordua,* 118 USPQ2d at 1634.

The Examining Attorney has adduced dictionary definitions showing that the word "SERIAL" means something that is published or broadcast in installments at regular intervals, *e.g.*:

- **MacMillan Dictionary**: Serial: "A story that is broadcast or published in a series of separate parts."

- **Dictionary.com**: Serial: "Anything published, broadcast, etc., in short installments at regular intervals, as a novel appearing in successive issues of a magazine."

- **Oxford Dictionary**: Serial: "A story or play appearing in regular installments on television or radio or in a periodical."[6]

Applicant produces an ongoing audio program, a podcast[7] appearing in regular weekly installments. According to its website:

> *Serial* tells one story – a true story – over the course of an entire season. Each season, we'll follow a plot and characters wherever they take us. And we won't know what happens at the end until we get there, not long before you get there with us. Each week we bring you the next chapter in the story, so it's important to listen to the episodes in order, starting with Episode 1.[8]

---

[6] Macmillan Dictionary, 3/20/2016; Dictionary.com, 3/20/2016; OxfordDictionaries.com /us/definition/American_english/ serial, 3/20/2016, March 22, 2016 Office Action TSDR pp. 29, 30, 34.

[7] "A podcast is a digital audio file about a specific topic that is released in a serial format for download to a computer or personal device." NUIGalway.ie 3/21/2016, March 22, 2016 Office Action TSDR p. 70.

[8] SerialPodcast.org 2/9/2015 Feb. 10, 2015 Office Action TSDR p. 10.

According to Applicant's manager and editorial adviser, Ira Glass, "The first season of the podcast ran for over two months, with a total of twelve episodes premiering on October 3, 2014 and concluding on December 18, 2014."[9] Applicant's Business Operations Manager, Elise Bergerson, echoed this description of Applicant's episodic program.[10] According to *Forbes* magazine, "Serial is a season-based podcast where a single story is discussed in detail over a dozen (or so) episodes."[11] According to the Examining Attorney, Applicant's sequential, episodic podcasts meet the dictionary definition of a serial: "the applicant's audio program is a serial in that it is broadcast in separate parts over a period of time."[12]

The genus of "ongoing audio program" in Applicant's identification of services encompasses both podcasts and radio broadcasts. As a *Cincinnati Enquirer* article put it, "Podcasts are reviving a declining radio art form—the serial, fictional or documentary, with a compelling story and characters so vivid you can almost see them."[13] The serial has long been a staple of the radio waves. There was, for example:

---

[9] Affidavit of Ira Glass, ¶ 5, Aug. 10, 2015 Response to Office Action TSDR p. 21.

[10] Affidavit of Elise Bergerson, ¶ 5, March 1, 2016 Response to Office Action TSDR p. 8.

[11] "Everything You Need to Know About Listening to Podcasts, My Favorite Free Form of Entertainment" Forbes.com, Sept. 22, 2016 Response to Office Action TSDR p. 29.

[12] Examining Attorney's brief 9 TTABVUE 7.

[13] *The Cincinnati Enquirer* May 10, 2015, March 22, 2016 Office Action TSDR p.17.



Some popular television programs, like the *Lone Ranger*, began as radio serials:



Another example is *Sky King*:

---

[14] SergeantPreston.com 9/1/2015 Sept. 1, 2015 Office Action TSDR p. 26.

[15] Entertainment.HowStuffWorks.com 3/17/2016, March 22, 2016 Office Action TSDR p. 48.



The tradition of radio serials continued through the decades. For example:



---

16 MidAtlanticNostalgiaConvention.com 2/10/2015, Feb. 10, 2015 Office Action TSDR pp. 42-45.

17 Search.credoreference.com 3/17/2016, March 22, 2016 Office Action TSDR p. 53.

And the tradition of radio serials continues to this day.[18]

Applicant argues that the Examining Attorney did not meet her burden of proving that SERIAL is a term that the relevant purchasing public understands primarily as the common name for ongoing audio programs. The references using the term "serial" as a noun are antiquated and archaic, Applicant contends, "referring to decades-old entertainment genres that are unlikely to affect the relevant public's primary perception of the term in the podcast era."[19] Applicant appends a table containing examples of these assertedly antiquated uses from the record:

| Quote | Generic Term | Time Frame |
|---|---|---|
| "Radio's most popular and longest running national **serial** was One Man's Family . . ." www.otrr.org (emphasis added). February 10, 2015 Office Action, TSDR p. 18. | Serial | 1932-1959 |
| "Airing over WJR, the radio **serial** featured the exploits of Scoop, played by Kasem, and his grandfather as they traveled the world in search of stories for the town newspaper." www.detroitkidshow.com (emphasis added). February 10, 2015 Office Action, TSDR p. 37. | Serial | 1940s |

---

[18] Public AccessTheatre.org 2/10/2015 Feb. 10, 2015 Office Action TSDR p. 16.

[19] Applicant's brief pp. 11, 7 TTABVUE 14.

| Quote | Generic Term | Time Frame |
|---|---|---|
| "Challenge of the Yukon began as a 15-minute **serial** airing locally on Detroit radio station WXYZ from 1938 until May 26, 1947 . . ." www.sergeanpreston.com (emphasis added). September 1, 2015 Office Action, TSDR p. 22. | Serial | 1938-1955 |
| "Regional authors also tend to be popular and Philip Solem recently published a story that he originally wrote and read as a **serial** on radio KAXE in the late 1980s." *Read to Keep Your Brain Active*, The Journal, February 16, 2016 (emphasis added). March 22, 2016 Office Action, TSDR p. 1. | Serial | 1980s |
| "1981 . ., Star Wars is adapted for American public radio, as a 13-episode **serial**." Idato, Michael, *Star Wars Year by Year*, The Age, December 11, 2015 (emphasis added). March 22, 2016 Office Action, TSDR p. 1. | Serial | 1981 |
| "The doughy hero of the BBC's first daily radio **serial**, *Dick Barton – Secret Agent*, running from 1945 to 1951." search.credoreference.com (emphasis added). March 22, 2016 Office Action, TSDR p. 19. | Serial | 1945-1951 |
| "The English detective-novelist created by Francis Durbridge for the radio **serial** *Send for Paul Temple* (1938) and its many sequels broadcast over the next 30 years." search.credoreference.com (emphasis added). March 22, 2016 Office Action, TSDR p. 20. | Serial | 1938 |
| "It began as a radio **serial** in 1978 and was later successfully adapted for television." search.credoreference.com (emphasis added). March 22, 2016 Office Action, TSDR p. 26. | Serial | 1978 |

[20]

Applicant admits that there are a few modern examples in the record of generic usage of "serial" as a noun, but maintains that these few instances pale in comparison to the "voluminous, recent and prominent" usage of "serial" as an *adjective*, describing a characteristic of audio programs, *e.g.*:[21]

| Quote | Generic Term | Time Frame |
|---|---|---|
| "[S]tudents and faculty have conceived, written, and produced a **serial radio drama** about AIDS that is currently being broadcast throughout the African continent" www.brooklyn.cuny.edu (emphasis added). February 10, 2015 Office Action, TSDR p. 11. | Radio Drama | 2002 |
| "The Radio Movement presents adapted radio **serial classics** . . ." www.pulicaccesstheatre.org (emphasis added). February 10, 2015 Office Action, TSDR p. 13. | Classics | Unclear |

---

[20] Applicant's brief pp. 11-12, 7 TTABVUE 14-15.

[21] Applicant's brief p. 12, 7 TTABVUE 15, *citing* Sept. 1, 2015 Office Action TSDR p. 25.

| | | |
|---|---|---|
| "Each *Chuckanut Radio Hour* features . . . an episode of 'The Bellingham Bean' **serial radio comedy** . . ." www.villagebooks.com (emphasis added). February 10, 2015 Office Action, TSDR p. 20. | Radio Comedy | 2014 |
| "McQuade, though, is most famous for playing Rosalie on the CBS version of *The Goldbergs*, which began in 1928 as a daily **serial drama** on radio." www.hollywoodreporter.com (emphasis added). February 10, 2015 Office Action, TSDR p. 24. | Drama | 1928 |
| "Originally, Sky King was a daily 15-minute **serial radio episode** . . ." www.midatlanticnostalgiaconvention.com (emphasis added). February 10, 2015 Office Action, TSDR p. 39. | Radio Episode | 1947 |
| "How to write a radio **serial drama** for social development: a script writers manual. . . . This book is a practical manual for script writers preparing radio **serial dramas** for development projects. . . . Enter-Educate **serial dramas** combine entertainment and education in a format that can be highly attractive to a listening audience." www.eldis.org (emphasis added). September 1, 2015 Office Action, TSDR p. 15. | Drama(s) | 1996 |
| "Audition set Saturday for actors to perform **serial radio drama**. . . . An open audition for the **serial radio drama** "Minutaie" will be held from noon to 3 p.m. Saturday at the United Methodist Church, 247 Golf Course Road." The Daily Gazette, February 11, 2016 (emphasis added). March 22, 2016 Office Action, TSDR p. 1. | Radio Drama | 2016 |
| "**Serial Radio Dramas** and Situational Comedies. . . . **Serial dramas** were set up to attract and keep audiences by weaving the same or similar storylines from episode to episode . . . . While the genres differed in their delivery, both **serial dramas** and situational comedies had one thing in common: the idea of the centralized character. . . . Typically 15 minutes in length, **serial dramas** and situational comedies usually stuck to a prescribed format." entertainment.howstuffworks.com (emphasis added). March 22, 2016 Office Action, TSDR pp. 21-22. | Radio Dramas Dramas | Unclear |
| "The popularity of the soap opera and the **serial drama** proved that daytime radio had a devoted audience and could be extremely profitable for sponsors whose products appealed to these listeners." memory.loc.gov (emphasis added). March 22, 2016 Office Action, TSDR p. 27. | Drama | 1941 |

[22]

Applicant posits that all of these adjectival uses of the term "serial" are descriptive, denoting the ongoing narrative nature of generic classes of programs like "radio drama," "radio comedy," "radio episode," or "drama." And since the term is descriptive, Applicant concludes, it can acquire distinctiveness under Section 2(f).[23]

But Applicant's distinction between nouns and adjectives is unavailing, as both can be generic. *Sheetz of Del., Inc. v. Doctor's Assocs. Inc.*, 108 USPQ2d 1341, 1366

---

[22] Applicant's brief pp. 9-10, 7 TTABVUE 12-13.

[23] Applicant's brief pp. 11, 13, 7 TTABVUE 14, 16.

(TTAB 2013) (finding adjective "footlong" generic in connection with sandwiches); s*ee also In re Cent. Sprinkler Co.,* 49 USPQ2d 1194, 1199 (TTAB 1998) ("[A]pplicant's mark does not present the classic case of a generic noun, but rather a generic adjective.").[24] For this reason, the TRADEMARK MANUAL OF EXAMINING PROCEDURE ("TMEP") states that "The expression 'generic name for the goods or services' is not limited to noun forms but also includes 'generic adjectives,' that is, adjectives that refer to a genus, species, category, or class of goods or services." *See generally* TMEP § 1209.01(c)(ii) (Oct. 2017) and cases cited therein.

Applicant's argument that "serial" is an antiquated term that the public no longer understands is similarly unavailing. Some of the programs discussed above may be from a bygone era, many decades past, but the term "serial" is frequently used in the present day, with no need to explain to contemporary readers or listeners what a serial is. Further, current dictionary definitions define "serial" as both a noun and an adjective, *e.g.*:

**American Heritage Dictionary**
*adj.* "Published or produced in installments, as a novel or television drama."
*n.* "A literary or dramatic work published or produced in installments."

**Merriam-Webster Dictionary**
*adj.* "appearing in successive parts or numbers."
*n.* "a story that is broadcast on television or radio or that is published in a

---

[24] *See also Rudolph Int'l., Inc. v. Realys Inc.*, 482 F.3d 1195, 82 USPQ2d 1375, 1377 (9th Cir. 2007) ("Adjectives, as well as nouns, can be generic marks.") (citation omitted); *Mil-Mar Shoe Co. v. Shonac Corp.*, 75 F.3d 1153, 37 USPQ2d 1633, 1639 (7th Cir. 1996) ("An easy 'noun versus adjective' test to signify a mark as either generic or descriptive, respectively, does not, however, adequately characterize the law of this circuit, nor would such a simplistic approach adequately embody fundamental principles of trademark law.") (footnote omitted).

magazine in separate parts over a period of time."[25]

Recent online articles also use the term "serial" as both a noun and adjective, generically denoting episodic broadcasts or podcasts:

- Brooklyn College, City University of New York website announces that "students and faculty have conceived, written, and produced a **serial radio drama** about AIDS...." A photo shows "A student 'on the air' in Brooklyn College's **radio serial**...."[26]

- The Atlanta Radio Theatre Company website presents a story "as a 1-hour standalone adventure and as a 12-part expanded **serial**!"[27]

- The Granite City Radio Theatre presents "a **radio drama serial**...."[28]

- The *Detroit News* reports on "Welcome to Night Vale," "a hugely successful podcast about supernatural goings-on in a fictional Southwest town, that is best described as 'A Prairie Home Companion' meets 'Twin Peaks.'" Narrator Cecil Baldwin "spoke with The Detroit News about the origins of the show and the surprise return of the traditional **radio serial**: …
  Q: What do you think about the resurgence of the classic **radio serial format** in the podcast era?"[29]

- The Columbia College Chicago radio station website states that "With the advent of podcasting, a resurgence of Theater of the Mind has led students of Columbia College Chicago to create contemporary tales in this traditional medium." It describes "a 15-part **audio serial**, written, directed and produced by Columbia College Chicago Radio students." "Judge for yourself as Columbia College Chicago students bring you a nine-part **serial**...."[30]

- The *Chattanooga Times Free Press* states, "Judged solely by its opening monologue, locally produced **radio serial** 'Horace Kentucky's Chronal

---

[25] American Heritage Dictionary AHDictionary.com, Feb. 10, 2015 Office Action TSDR p. 5; Merriam-Webster.com, March 22, 2016 Office Action TSDR pp. 37-38.

[26] www.Brooklyn.cuny.edu Feb. 10, 2015 Office Action TSDR pp. 14-15.

[27] Artc.org 9/1/2015 Sept. 1, 2015 Office Action TSDR pp. 12-13.

[28] Ppfive.com 9/1/2015 Sept. 1, 2015 Office Action TSDR pp. 21-22.

[29] DetroitNews.com 5/8/2016, downloaded 3/21/2016, March 22, 2016 Office Action TSDR p. 71.

[30] Colum.edu 3/21/2016, March 22, 2016 Office Action TSDR p. 73.

Detective Agency' sounds like just another boilerplate noir drama stapled together by a series of cliches." "Thanks to the ease of digital recording and self-publishable podcasts, the conditions are ripe for a resurgence of **serials** like 'Horace Kentucky,' says WUTC radio personality Richard Winham."[31]

These and other Internet articles and websites of record show that the term "serial," whether it is used as a noun or an adjective, refers categorically to ongoing audio programs—programs that may emanate from multiple sources, not just a single source. These examples of producers and commentators using the term to refer to a category of services is persuasive evidence that the term would be perceived by the relevant public, listeners of audio programs, as a generic designation of those services. *See In re Northland Alum. Prods., Inc.*, 777 F.2d 1556, 227 USPQ 961 (Fed. Cir. 1985) (cookbooks and newspaper articles show "bundt" generic for a kind of cake); *In re Noon Hour Food Prods. Inc.*, 88 USPQ2d 1172 (TTAB 2008) (use of "Bond-ost" in books, government and trade publications, on the Internet, and in newspapers and magazines available to members of the general public shows term is generic for a type of cheese); *Cont'l Airlines, Inc. v. United Air Lines, Inc.*, 53 USPQ2d 1385 (TTAB 1999) (use of term "e-ticket" by media and competitors indicates term is generic for electronic tickets).

Applicant, relying on *In re Northland,* argues that since its debut in October 2014, over 12,000 media stories have referred to its SERIAL podcast. These media stories appeared in publications such as the *New York Times, Washington Post, Wall Street*

---

[31] www.timesfreepress.com 3/21/2016, March 22, 2016 Office Action TSDR pp. 74, 77.

*Journal, LA Times, The New Yorker, The Atlantic, The Boston Globe, Rolling Stone,* and *USA Today*.[32] For example:

The New York Times | http://nyti.ms/1vfPqFK

MEDIA

'Serial,' Podcasting's First Breakout Hit, Sets Stage for More

NOV. 23, 2014

THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

http://www.wsj.com/articles/serial-podcast-catches-fire-1415921853

ARTS & ENTERTAINMENT

'Serial' Podcast Catches Fire

In the sleepy world of podcasts, 'Serial' has emerged as a global phenomenon

[33]

As Applicant notes, other podcasts' success came to be measured by comparison with "SERIAL"; media coverage termed successful programs "Serial-like" or "Serialesque." Due to its mainstream popularity, many online lists of the best podcasts expressly excluded it, e.g. "8 of the Best Podcasts Out there (Other Than 'Serial')."[34]

"If the SERIAL mark were primarily perceived as a generic term," Applicant urges, "it would be natural—even necessary—for such publications to include some

---

[32] Affidavit of Elise Bergerson ¶ 7, Sept. 22, 2016 Response to Office Action TSDR p. 11; Applicant's brief p. 13, 7 TTABVUE 16; Affidavit of Ira Glass ¶ 13, Aug. 10, 2015 Response to Office Action TSDR p. 21.

[33] Aug. 10, 2015 Response to Office Action TSDR pp. 48, 52.

[34] Affidavit of Ira Glass ¶¶ 15-16, Aug. 10, 2015 Response to Office Action TSDR p. 25; Affidavit of Elise Bergerson ¶ 9, Sept. 22, 2016 Response to Office Action TSDR p. 11.

explanation that their use of the term SERIAL is intended as a reference to the SERIAL podcast rather than as a generic reference to a certain type of audio program." "Otherwise, the reader would understand 'Serial-like' and 'Serialesque' to describe any audio program that is published at regular intervals…." Yet Applicant is unaware of any instances in which such an explanation has been included in the extensive media coverage.[35]

The media stories to which Applicant refers, however, use capitalization, italics, quotation marks and/or context, rather than explanations, to indicate that the "*Serial*" to which they refer is one particular serial. For example:

- "SERIAL": THE PODCAST WE'VE BEEN WAITING FOR

- 'Serial,' Podcasting's First Breakout Hit, Sets Stage for More

- 'Serial' Podcast Catches Fire

- 'Serial' podcast makes Thursdays a Must-Listen event

- *Serial* Is Like Nothing I've Heard or Watched Before[36]

And these exist along with the previously cited articles, websites, and Internet stories referring to serials produced by others who have used the term in its generic sense, meaning a work that is published or produced in installments. *See In re Northland*, 227 USPQ 961.

---

[35] Applicant's brief p. 13, 7 TTABVUE 16; Applicant's reply brief p. 5, 10 TTABVUE 8.

[36] *The New Yorker* Oct. 9, 2014, *The New York Times* Nov. 23, 2014, *The Wall Street Journal* Nov. 13, 2014, *Entertainment Weekly,* EW.com, Oct. 30, 2014, *Slate* Oct. 3, 2014, Aug. 10, 2015 Response to Office Action TSDR pp. 42, 48, 52, 64, 68.

Applicant nevertheless contends that the mix of generic and non-generic uses in the record precludes a finding of genericness.[37] This is incorrect, however, for two reasons. First, in this case, the so-called "mix" is of noun and adjective senses of the word "serial," both of which are generic. Second, even though some other articles refer to Applicant's serial podcast by its given name, "Serial," that amounts, at most, to "de facto secondary meaning" in a generic term. *See, e.g.*, *In re Northland Aluminum Prods., Inc.*, 777 F.2d 1556, 227 USPQ 961, 964 (Fed. Cir. 1985) ("Having affirmed the Board's conclusion that BUNDT is a common descriptive name, neither obsolete nor obscure, evidence of secondary meaning can not change the result.") (citations omitted); *Roselux Chem. Co. v. Parsons Ammonia Co., Inc.,* 299 F.2d 855, 132 USPQ 627, 634 (CCPA 1962) ("To show that a common descriptive name has acquired a de facto secondary meaning, in the sense that some or even many people have come to associate it with a particular producer, is not in itself enough to show that it has become entitled to registration as a trademark."); *see also In re Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 828 F.2d 1567, 4 USPQ2d 1141, 1142 (Fed. Cir. 1987) ("To allow trademark protection for generic terms, *i.e.*, names which describe the genus of goods being sold, *even when these have become identified with a first user*, would grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are.") (emphasis added). As our primary reviewing Court has held:

> While it is always distressing to contemplate a situation in which money has been invested in a promotion in the mistaken belief that trademark rights of value are being created, merchants act at their peril in

---

[37] Applicant's brief p. 14, 7 TTABVUE 17, *citing Merrill Lynch,* 4 USPQ2d at 1143-44.

attempting, by advertising, to convert common descriptive names, which belong to the public, to their own exclusive use. Even though they succeed in the creation of de facto secondary meaning, due to lack of competition or other happenstance, the law respecting registration will not give it any effect.

*In re Pennington Seed Inc.,* 466 F.3d 1053, 80 USPQ2d 1758, 1762 (Fed. Cir. 2006) (*quoting Weiss Noodle Co. v. Golden Cracknel & Specialty Co.,* 290 F.2d 845, 129 USPQ 411, 414 (CCPA 1961)).

In sum, we find that the word SERIAL is generic for Applicant's identified services.

### B. The Proposed Standard Character Mark, SERIAL, Has Not Acquired Distinctiveness

Despite having held that the term SERIAL is generic for Applicant's services, for completeness we turn to the Examining Attorney's alternative refusal that SERIAL is merely descriptive and has not acquired distinctiveness. As the Examining Attorney correctly notes, Applicant's unequivocal claim of acquired distinctiveness under Section 2(f) tacitly concedes that the applied-for marks are not inherently distinctive, and must acquire distinctiveness to be registrable. *See Cold War Museum, Inc. v. Cold War Air Museum, Inc.,* 586 F.3d 1352, 92 USPQ2d 1626, 1629 (Fed. Cir. 2009); *Yamaha Int'l Corp. v. Hoshino Gakki Co.,* 840 F.2d 1572, 6 USPQ2d 1001, 1005 (Fed. Cir. 1988). "A mark that has acquired secondary meaning may serve as a trademark and be protected even if the mark was not distinctive at the time of its adoption." *G.H. Mumm & Cie v. Desnoes & Geddes Ltd.,* 917 F.2d 1292, 16 USPQ2d 1635, 1637 (Fed. Cir. 1990).

Applicant has the burden of proving acquired distinctiveness. *In re La. Fish Fry Prods.,* 116 USPQ2d at 1264. "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11, 214 USPQ 1, 4 n.11 (1982). *See also In re Steelbuilding.com,* 415 F.3d 1293, 75 USPQ2d 1420, 1422 (Fed. Cir. 2005) ("To show that a mark has acquired distinctiveness, an applicant must demonstrate that the relevant public understands the primary significance of the mark as identifying the source of a product or service rather than the product or service itself.") *quoted in Apollo Med. Extrusion Techs., Inc. v. Med. Extrusion Techs., Inc.,* 123 USPQ2d 1844, 1851 (TTAB 2017). The kind and amount of evidence necessary to establish that a proposed mark has acquired distinctiveness in relation to goods or services depends on the nature of the proposed mark and the circumstances surrounding its use. *In re Steelbuilding.com*, 75 USPQ2d at 1424 ("the applicant's burden of showing acquired distinctiveness increases with the level of descriptiveness; a more descriptive term requires more evidence of secondary meaning.") .

For the reasons set forth above, Applicant's standard character mark SERIAL, if not generic, is at best highly descriptive of its identified services, "entertainment in the nature of an ongoing audio program featuring investigative reporting, interviews, and documentary storytelling." "Highly descriptive terms … are less likely to be perceived as trademarks and more likely to be useful to competing sellers than are

less descriptive terms. More substantial evidence of acquired distinctiveness thus will ordinarily be required to establish that such terms truly function as source-indicators." *Alcatraz Media Inc. v. Chesapeake Marine Tours Inc.,* 107 USPQ2d 1750, 1767 (TTAB 2013), *aff'd mem.*, 565 Fed. Appx. 900 (Fed. Cir. 2014).

To prove acquired distinctiveness, an applicant may show not only the length and exclusivity of its use of its marks, but also its sales success, unsolicited media coverage, copying, and any similar evidence showing wide exposure of its marks to consumers in a manner that would educate them to view the marks as source indicators, coupled with evidence of the effectiveness of these measures in inducing the purchasing public to identify the marks with their source. *See In re Steelbuilding.com,* 75 USPQ2d at 1424; *Apollo Med. Extrusion,* 123 USPQ2d at 1851-52; *In re Keep A Breast Found.,* 123 USPQ2d 1869, 1882 (TTAB 2017); Trademark Rule 2.41(a)(3), 37 C.F.R. § 2.41(a)(3). "The ultimate test in determining whether a designation has acquired distinctiveness is Applicant's success, rather than its efforts, in educating the public to associate the proposed mark with a single source." *Mini Melts, Inc. v. Reckitt Benckiser LLC,* 118 USPQ2d 1464, 1480 (TTAB 2016).

Although Applicant has used its logos in commerce for a relatively short period of time, Section 2(f) is permissive, allowing for proof of acquired distinctiveness by other means. *See In re Fox River Paper Corp.,* 99 USPQ 173, 174 (Comm'r Pats. 1953) ("A mark may become distinctive within a period of time much shorter than five years…."), *cited in* TMEP § 1212.01 ("The applicant may present any competent evidence to establish that a mark has acquired distinctiveness. Actual evidence of

acquired distinctiveness may be submitted regardless of the length of time the mark has been used.").

In this case, Applicant alludes not only to the 12,000 media stories about its program but to a sharp spike in Google® Internet searches for the phrase "podcast serial" following the launch of its podcast.[38] Applicant also measures its success in terms of number of downloads, not dollars. Like most podcasts, Applicant's SERIAL podcast is available without charge, so in lieu of measuring consumer purchases, it points to downloads as another way of measuring the acquisition of services by consumers and the extent of their exposure to the marks. Applicant's first season, in the fall of 2014 was, in its words, "an immediate event in pop culture," with daily downloads that generally exceeded 200,000 and reached as high as 1.4 million. During its second season, its daily downloads averaged 570,000 and reached as high as 1.7 million. As of September 21, 2016, episodes of Applicant's SERIAL podcast had been downloaded over 172 million times in the United States. Throughout its first two seasons, it ranked as the number one podcast on iTunes®, the media source of Applicant's downloads.[39]

The Examining Attorney acknowledges that "Applicant provided evidence of high sales figures in the form of number of downloads of applicant's ongoing audio

---

[38] Applicant's brief p. 16, 7 TTABVUE 19, Affidavit of Ira Glass, ¶ 11, Aug. 10, 2015 Response to Office Action TSDR p. 20.

[39] Applicant's brief p. 17, 18 n.3, 7 TTABVUE 20-21; Affidavit of Ira Glass ¶¶ 6-8, Aug. 10, 2015 Response to Office Action TSDR p. 22; Affidavit of Elise Bergerson ¶¶6-8, March 1, 2016 Response to Office Action TSDR pp. 8-9; Affidavit of Elise Bergerson ¶ 5, Sept. 22, 2016 Response to Office Action TSDR p. 10.

program," but argues that extensive figures of this sort demonstrate the commercial success of its services, not consumer recognition of its mark for those services.[40] With respect to the standard character mark SERIAL, we agree. Evidence of the commercial success of a product or service does not necessarily also mean that the consuming public perceives the mark used in connection with such products or services as primarily a source-indicator. *See, e.g., In re Bongrain Int'l (Am.) Corp.*, 894 F.2d 1316, 3 USPQ2d 1727, 1729 (Fed. Cir. 1990) ("The Board likewise ruled correctly that appellant's evidence as to acquired distinctiveness or secondary meaning was insufficient to permit registration under Section 1052(f). Growth in sales was the principal factor upon which appellant relied to show distinctiveness. But, as the Board observed, this may indicate the popularity of the product itself rather than recognition of the mark 'BABY BRIE' as indicative of origin; or it may indicate acceptance of Bongrain's other mark 'Alouette', which was used along with 'BABY BRIE' on the packages."). In particular, where the media coverage uses devices such as capitalization, italics, and quotation marks to designate Applicant's program in particular, we do not think that Internet searches for the qualified phrase "podcast serial" and the number of downloads shows consumer acceptance of the source-indicating nature of the word SERIAL. In short, the evidence is insufficient to meet Applicant's heavy burden of proving that that the word SERIAL, taken alone, has acquired distinctiveness under Section 2(f).

---

[40] Examining Attorney's brief, 9 TTABVUE 17-18, *citing In re Boston Beer Co.*, 198 F.3d 1370, 1371-73, 53 USPQ2d 1056, 1057-58 (Fed. Cir. 1999); *In re Busch Entm't Corp.*, 60 USPQ2d 1130, 1132-34 (TTAB 2000).

## II.  THE COMPOSITE LOGOS

Our finding that Applicant's proposed standard character mark SERIAL is not registrable is not dispositive, however, of whether Applicant's composite logos, **SERIAL** and **SERIAL**, are registrable. A composite mark may be registrable even when its word portion, taken alone, is not:

> As the Board has previously held, "[a] display of descriptive or otherwise unregistrable matter is not registrable on the Principal Register unless the design features of the asserted mark create an impression on the purchasers separate and apart from the impression made by the words themselves, or if it can be shown by evidence that the particular display which the applicant has adopted has acquired distinctiveness."

*Cordua,* 118 USPQ2d at 1639 (quoting *In re Sadoru Grp., Ltd.,* 105 USPQ2d 1484, 1486 (TTAB 2012)). *See generally* MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 12:40 (5th ed. March 2018).

### A. The Composite Logos Are Not Generic As a Whole

The Examining Attorney asserts that the composite logos are generic because the word SERIAL is generic and the design elements are non-distinctive. We have found that SERIAL is generic. And we agree that the design elements—the typeface and color of the letters and the rounded rectangular backdrops for each letter are not inherently distinctive. But that does not end our inquiry. We must ascertain whether the composite logos, taken as a whole, have come primarily to indicate source.  If they have, then the two SERIAL & Design marks may be registered with entry of a disclaimer of Applicant's exclusive rights in the term SERIAL apart from the marks as shown.

## B. Applicant's Burden of Proving That the Composite Marks Have Acquired Distinctiveness

As noted above, it is Applicant's burden to establish acquired distinctiveness. *In re La. Fish Fry Prods.,* 116 USPQ2d at 1264. In this case, Applicant's burden is particularly heavy because the elements of its logos, apart from the wording, are common, and as such do not tend to create a commercial impression as source indicators. *See, e.g., In re Viterra Inc.,* 671 F.3d 1358, 101 USPQ2d 1905, 1911 (Fed. Cir. 2012). First, "one should also remember that the association by the relevant public of a *generic* term in a nondistinctive display 'sets a much higher and different standard of proof and persuasion than is required for descriptive terms.'" *In re Am. Acad. of Facial Plastic and Reconstructive Surgery,* 64 USPQ2d at 1756 (quoting MCCARTHY §12:40 (4th ed. Dec. 2001)).

Second, Applicant's logos depict the word SERIAL in nondescript *san serif* capital letters, which reflects very little stylization. *See generally In re Sadoru*, 105 USPQ2d at 1487 (common and prosaic lettering with minimal stylization unlikely to make impression on purchasers). Applicant claims the coloring of the letters in Application Serial No. 86464485—yellow outlined in red—as a feature of the mark. The coloring of letters does not generally tend to render a mark distinctive. *See In re Grande Cheese Co.,* 2 USPQ2d 1447, 1449 (TTAB 1986) ("We think it likely that purchasers … would not see the lettering style or coloring of the generic designations as an indicium of source."), *cited in In re Sadoru,* 105 USPQ2d at 1486. *See also* TMEP § 807.14(e)(ii) ("In most cases, the color in the lettering is unlikely to have a significant impact on the commercial impression created by the mark."). In Applicant's mark,

however, the coloring does serve to enhance the letters' contrast with their black rectangular background, and contributes somewhat to the mark's capability of acquiring distinctiveness. *See also* TMEP § 807.14(e)(ii) ("With respect to … generic word marks, the color element of the wording is likely to be the more dominant portion in creating the commercial impression of the mark.") (citing *Courtenay Commc'ns Corp., v. Hall,* 334 F.3d 210, 67 USPQ2d 1210, 1214-15 (2d Cir. 2003) (even if words in composite mark are generic, its distinctiveness must be considered as a whole, including coloring and design elements).

Third, the logos place each letter in a rectangle with rounded corners, akin to a tile in a board game:



Most common geometric shapes, such as circles, squares, triangles, ovals, and rectangles, when used as backgrounds for the display of word marks, are not considered inherently distinctive, and have difficulty acquiring distinctiveness. *See In re Benetton Grp. S.p.A.,* 48 USPQ2d 1214, 1215-16 (TTAB 1998) ("The evidence of distinctiveness offered by applicant is insufficient to persuade us that the green rectangle design, used solely as a background for applicant's word and/or design marks, has become recognized as a trademark for the clothing items to which the green rectangle design is applied."); *In re Anton/Bauer Inc.,* 7 USPQ2d 1380, 1381 (TTAB 1988) (insufficient evidence to show that applicant's background parallelogram designs had come to be recognized as trademarks for battery supplies). As McCarthy has observed, "The policy behind this rule seems clear: no one seller

should be allowed to appropriate such commonplace shapes as circles, squares, and ovals and claim only he can use such a shape as a background for his word mark. The rationale is that such designs have been so widely and commonly used as mere decorative graphic elements that the origin-indicating ability of such designs has been diminished." MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 7:29, *quoted in In re Benetton,* 48 USPQ2d at 1216. *See generally* TMEP § 1202.11.

As an exception to this general rule, Applicant cites *In re Raytheon Co.,* 202 USPQ 317 (TTAB 1979), in which the Board found that the electronic tube manufacturer's oval background design



had acquired distinctiveness separate and apart from the word mark RAYTHEON, for which it ordinarily formed a backdrop. While it is possible for a geometric background shape to acquire distinctiveness, as in *Raytheon*, we agree with the Examining Attorney that that case is distinguishable from the one before us.[41] In *Raytheon*, the applicant used the background design depicted above for nine years in the course of selling 45 million electron tubes bearing its mark via distributors to radio and television repair establishments. In addition to its own affidavits of extensive sales and advertising over a prolonged period of time, Raytheon submitted

---

[41] Examining Attorney's brief, 9 TTABVUE 14.

a statement from a distributor and survey evidence from radio and television repair establishments showing that these businesses recognized the design element alone, separate and apart from the word "RAYTHEON," as a mark identifying and distinguishing the applicant's electron tubes. *Raytheon*, 202 USPQ at 319-20; *see In re Anton/Bauer,* 7 USPQ2d at 1382.

We find that Applicant's rectangles (shown below, on its website) are less distinctive background carriers than *Raytheon's* oval-in-a-rectangle design mark, but more distinctive than, hypothetically, a single rectangle framing the entire word SERIAL.



*See In re Dixie Rests. Inc.,* 105 F.3d 1405, 41 USPQ2d 1531, 1534 (Fed. Cir. 1997) (rectangular "design is an ordinary geometric shape that serves as a background for the word mark."), *quoted in In re Morinaga Nyugyo K. K.,* 120 USPQ2d 1738, 1742 (TTAB 2016). We further find that the slight rounding or beveling of the rectangles' corners is a mere refinement that is commonplace in geometric designs. *Cf. In re Chevron Int. Prop. Grp. LLC*, 96 USPQ2d 2026, 2029 (TTAB 2010) (beveled six-sided

---

[42] SerialPodcast.org, 2/9/2015, Feb. 10, 2015 Office Action TSDR p. 7.

three dimensional shape a mere refinement of commonly used form). *Id.* In this respect, the present case is more closely analogous to *Benetton*, where the Board found that the green rectangular tags bearing the name BENETTON or a BENETTON logo had not acquired distinctiveness in the clothing industry separate and apart from the word marks or logos superimposed upon them. *In re Benetton,* 48 USPQ2d at 1216-17.

In sum, we think the degree of distinctiveness of the design elements, even viewed all together, places the design elements of the two composite marks on the less distinctive part of the spectrum. Thus, Applicant's burden of proving that the logos have acquired distinctiveness is fairly high in both composite marks, although not quite as high for Application Serial No. 86464485 in view of the yellow and red coloring of the letters.

## C. The Composite Logos, Taken in their Entireties, Have Acquired Distinctiveness

Our finding above that the wording, lettering, coloring, and geometric background components of the logos are not inherently distinctive, whether viewed separately or all together, does not fully resolve the issue. We must also examine whether the composite logos, SERIAL and SERIAL, taken in their entireties, have acquired distinctiveness in the public mind. *See Cordua,* 118 USPQ2d at 1639. We find that they have. *Cf. In re School Book Fairs, Inc.,* 229 USPQ 556, 557 (TTAB 1986) ("The point is not whether this one feature of the mark is so prominent that it presently acts as a source identifier, but rather whether the

unusualness of the mark in its entirety is such that the mark as a whole could ever function to indicate the source of applicant's services"); *In re Trail-R-Van, Inc.,* 188 USPQ 590, 591 (TTAB 1975) ("In the case of a composite mark, although the literal portion thereof may be unregistrable, per se, as the common descriptive or generic name for a particular mark, the display of the words in association with a design might well make it capable as a whole of distinguishing the goods in connection with which it is used."). In so doing, we focus on the commercial impression made by the logos as a whole.

Just as multiple media stories have framed "Serial" with quotation marks, thereby indicating that the authors understand it to be a single serial, distinct from other serials, Applicant's composite logos,  and

, perform the same function, framing SERIAL with rounded black rectangles. That the composite logos have successfully achieved public recognition as source indicators is evidenced in the record. The record reveals that others have created copies and parodies featuring these design elements. *Saturday Night Live* has parodied the program using the composite mark:





[44] We find this unusual evidence to be highly significant. We take judicial notice that *Saturday Night Live* has been broadcast weekly on a national television network since the mid-1970s, and that it frequently parodies events or things that are known to a large segment of the show's broad U.S. audience.[45] We find that the

---

[43] Aug. 10, 2015 Response to Office Action TSDR p. 62.

[44] Aug. 10, 2015 Response to Office Action TSDR p. 83.

[45] *See generally Encyclopedia.com*, www.encyclopedia.com/history/dictionaries-thesauruses-pictures-and-press-releases/Saturday-night-live; *Oxford Dictionary*, www.oxfordlearnersdictionaries.com/us/definition/English/Saturday-night-live; *The Encyclopedia of Television*, www. Museum.tv/eotv/SaturdayNigh.htm 3/19/2018. The Board may take judicial notice of information in encyclopedias. *B.V.D. Licensing Corp. v. Body*

fact that such a long-running, famous, national weekly television show has parodied Applicant's service using an almost identical graphical display is highly probative of acquired distinctiveness. Indeed, even *Sesame Street* has created such



a parody: [46]

Together, we think the parodies in the record in this case constitute highly unusual and highly significant evidence. These national parodies making prominent use of the design aspects of the marks—especially that of *Saturday Night Live*—evince the distinctiveness of the composite logos, as a mark has to be well known in the first place to be parodied. *See, e.g. Louis Vuitton Malletier S.A. v. Haute Diggity Dog LLC,* 507 F.3d 252, 84 USPQ2d 1969, 1975 (4th Cir. 2007) ("It is a matter of common sense that the strength of a famous mark allows consumers immediately to perceive the target of the parody, while simultaneously allowing them to recognize the changes to

---

*Action Design Inc.,* 846 F.2d 727, 6 USPQ2d 1719, 1721 (Fed. Cir. 1988); *In re Weiss Watch Co.,* 123 USPQ2d 1200, 1205 n. 12 (TTAB 2017).

[46] Affidavit of Ira Glass, Aug. 10, 2015 Response to Office Action TSDR p. 24.

the mark that make the parody funny or biting."); D.S. Welkowitz *"Trademark Parody after Hustler Magazine v. Falwell,"* 11 Comm. & L. 65, 72 (Dec. 1989) ("Hence, a parody, to be effective, virtually requires that it parody a well-known trademark.").

In addition, the record contains evidence of unauthorized copying of the composite marks. The **Wall Street Journal** reports that "[t]he show has seized the popular imagination and developed an unusually intense following. High-school English teachers have abandoned their normal lesson plans and are having their classes follow along," and in that article depicted the use of the composite mark on a high school bulletin board:



A bulletin board at Lakes Community High School. *EMILY CODY* [47]

Similarly, copiers' unauthorized merchandise bears silent testament to public demand for articles of clothing bearing the logos:

---

[47] Wall Street Journal wsj.com "'Serial' Podcast Catches Fire" 7/28/2015, Aug. 10, 2015 Response to Office Action p. 52-54.





.[48] *See*

*Steelbuilding.com*, 75 USPQ2d at 1424 (unauthorized copying is evidence of acquired distinctiveness).[49]

Overall, we find that the logos—their light-colored letters superimposed upon contrasting dark rectangles with rounded corners, as in a crossword puzzle or tiles on a board game—have grown so much in general recognition that the relevant public views them as identifying a unique source. The yellow and red coloring of the letters superimposed on the black, rounded rectangles in **SERIAL** adds to that logo's distinctiveness, as evidenced by the parodies and copies, which take pains to replicate its coloring.[50] Based on the totality of the unique evidence of record in this case, we find that Applicant has borne its burden of proving *prima facie* that when

---

[48] Aug. 10, 2015 Response to Office Action TSDR p. 87.

[49] Applicant would do well to remember that, while copying is significant evidence of secondary meaning, if left unchecked it can result in the weakening of rights in a mark, or even abandonment. *See, e.g.*, *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 48 USPQ2d 1065, 1076 (5th Cir. 1998) (weakening); *Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 77 USPQ2d 1981, 1985 n.11 (5th Cir. 2006) (abandonment).

[50] It is important to note that this case involves unauthorized copying of the design elements of a composite word + design mark. By contrast, in product configuration cases, evidence of copying does not by itself give rise to an inference of acquired distinctiveness. That is because, as noted in TMEP 1212.06(e)(i), "[w]here the proposed mark is a product design, the copier may be attempting to exploit a desirable product feature, rather than seeking to confuse customers as to the source of the product." *In re Van Valkenburgh*, 97 USPQ2d 1757, 1768 (TTAB 2011)."

all the elements are taken together, its two composite marks have acquired distinctiveness. 15 U.S.C. § 1052(f); 37 C.F.R. § 2.41(a)(3). To be clear, our finding of acquired distinctiveness is limited to the particular display of the composite marks as a whole. It does not extend to the individual components of the marks, taken separately, or anything less than the whole marks. *See generally Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 4 USPQ2d 1793, 1796-98 (Fed. Cir. 1987), *cited in Montecash LLC v. Anzar Ent. Inc.,* 95 USPQ2d 1060, 1064 n.6 (TTAB 2010); and *Tea Bd. of India v. Republic of Tea, Inc.*, 80 USPQ2d 1881, 1884 n.5 (TTAB 2006).

## III.   CONCLUSION

On consideration of all the record evidence, including those portions we have not specifically recited, we find that the word SERIAL, which forms the entirety of Applicant's proposed standard character mark and the literal portion of Applicant's composite logos, is generic for Applicant's identified services. The logos, however, have acquired distinctiveness, and, provided that Applicant disclaims the word SERIAL, may proceed to publication. Trademark Rule 2.142(g), 37 C.F.R. § 2.142(g); TMEP §§ 1213.03(b), 1213.05(g); *In re Clutter Control, Inc.,* 231 USPQ 588, 589-90 (TTAB 1986).

**Decision**:

The refusal to register based on genericness is affirmed as to Serial No. 86454420 and reversed as to Serial Nos. 86454424 and 86464485. The refusals to register based on mere descriptiveness without a sufficient showing of acquired distinctiveness are affirmed as to all three applications, but will be set aside as to Application Serial Nos.

86454424 and 86464485, provided that Applicant disclaims the word SERIAL in each mark. Applicant is allowed until 63 DAYS from the mailing date of this decision to submit the disclaimers, in which case these two applications will proceed to publication under Section 2(f) based on a showing of acquired distinctiveness. [51]

---

[51] The standardized format for the required disclaimer text is as follows: "No claim is made to the exclusive right to use the word 'SERIAL' apart from the mark as shown." TMEP § 1213.08(a)(i). A disclaimer should be submitted in each application to which it applies.